Filed 8/26/25  Frank X. Ruiz Avionics v. Grossman CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| FRANK X. RUIZ AVIONICS, INC., et al.<br><br>   Plaintiffs, Cross-defendants, and Respondents,<br><br>      v.<br><br>KENNETH R. GROSSMAN,<br><br>   Defendant, Cross-complainant, and Appellant. | F087817<br><br>(Super. Ct. No. 22CECG03248)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  D. Tyler Tharpe, Judge.

Chapman Law and Zena M. Sin-Zaragoza for Defendant, Cross-complainant and Appellant.

H. Ty Kharazi for Plaintiffs, Cross-defendants and Respondents.

-ooOoo-

This is a contract dispute between appellant Kenneth R. Grossman (Grossman) and respondents Frank X. Ruiz Avionics, Inc.  (FRA) and Frank Ruiz (Ruiz) (collectively respondents) involving upgrades to the avionics system of an airplane.  FRA sued Grossman for the balance owed for incomplete upgrades to Grossman's airplane, while Grossman cross-complained against respondents for fraud and breach of contract.  A jury found in favor of FRA and against Grossman.  Grossman contends that the trial court

reversibly erred by: (1) admitting FRA's invoices at trial even though the invoices were inadmissible hearsay; (2) excluding the testimony of witness Richard Paivana under Evidence Code section 352[1]; and (3) failing to grant a motion for judgment notwithstanding the verdict (JNOV). We affirm.

## PROCEDURAL BACKGROUND

In October 2022, FRA filed a complaint in the Fresno County Superior Court. The complaint, in part, alleged claims for breach of contract and a common count for goods and services rendered/quantum meruit.

In March 2023, Grossman filed a cross-complaint against respondents that generally alleged claims for fraud and breach of contract.

Trial began on January 8, 2024, and concluded on January 16, 2024. The jury found in favor of FRA on its claims of breach of contract and quantum meruit and awarded $24,000 in damages; the jury found against Grossman on all his claims. After the verdict was received and the jury excused, Grossman made a motion for directed verdict.[2] The trial court found that there was "sufficient evidence" to support the verdict and denied Grossman's motion.

On March 28, 2024, Grossman appealed.

## FACTUAL BACKGROUND

### I. General Background.

Respondents perform avionics[3] services on airplanes at Chandler Airfield. Grossman owns two airplanes. For about 20 years, Grossman took his planes to respondents for avionics maintenance, upgrades, and testing. Grossman wanted to

---

[1] All further statutory references are to the Evidence Code.

[2] The parties appear to agree that Grossman's counsel misspoke and that a motion for JNOV was intended. We agree and will view the motion as one for a JNOV.

[3] In general, "avionics" refers to an airplane's electronics systems, such as communications, navigation, and autopilot, which helps the pilot fly the airplane, know his location and the current conditions, and to communicate with air traffic control.

2.

upgrade the autopilot system on one of his planes, a Beechcraft Baron that was manufactured in 1977 (the plane). Grossman and Ruiz orally agreed that FRA would install the upgrades. Grossman flew the plane to FRA's hangar in March 2020 so that Ruiz could begin making upgrades. However, in July 2020 and November 2020, Grossman and FRA decided to install additional avionics equipment and upgrades. The upgrades requested by Grossman were very extensive. The total cost for the upgrades was estimated to be around $110,000. Although no firm deadline was set for the project's completion date, FRA provided estimates for the hours of labor necessary to complete the project.

After about 19 months had passed, the upgrades on the plane were still not complete. Grossman informed Ruiz that he wanted to take his plane back, but Ruiz would not release the plane until Grossman paid additional sums for services rendered. Up to that point, Grossman had paid Ruiz over $130,000. Grossman instituted a civil lawsuit against FRA and obtained a writ of possession. Grossman repossessed the plane and moved it from FRA's hangar to another hangar at Chandler Airfield in March 2022. Once Grossman retrieved the plane, he dropped his lawsuit against FRA. FRA then instituted this action to obtain payment for services rendered, as well as consequential damages from Grossman's failure to pay his balance.

## II.     Trial.

### A.     *Testimony of Ruiz.*

At trial, Ruiz testified that he had been involved with electronics in the military and entered the avionics business after his military service ended around 1966. Ruiz eventually started his avionics business at Chandler Airfield in 1969 and remained there until March 2022, when he was evicted for failing to pay rent. Ruiz has never been investigated, suspended, cited, or criticized by the FAA for his work on airplanes.

In order to make the extensive upgrades to the plane's avionics system, Ruiz explained (either expressly or by necessary implication) that he needed to: create

schematic plans for the wiring and installation of each avionics device; design and build metal harnesses for each of the avionics devices; obtain the new avionics devices; remove the instrument panel, headliner, upholstery, paneling, seats, old wiring (while ensuring that nonavionics wiring stays in place), and old avionics devices and their harnesses; install new wiring and new harnesses; install the new harnesses; remove, move, or modify some existing equipment or build new complimentary equipment; test/check the wiring against the schematics; test various systems on the plane; install and test the new avionics systems; install software updates; reinstall existing equipment and the interior of the plane; and, upon completion of all tasks, sign off on a logbook that repairs had been made and the airplane was airworthy. Ruiz also described in greater detail various aspects of the work that he performed during the project, including explaining the contents of photographs that depicted particular projects and steps in the upgrading process. Ruiz testified that the process to actually install the upgrades was very time consuming and that he had installed thousands of components/pieces (including rivets, screws, and connectors) during the course of the project. Ruiz also testified that he tended to work slow because of the possible consequences of improper installation. Ruiz testified that the project would probably take a year to a year-and-a-half to complete and stated in a deposition that it would take "probably a year."

Ruiz testified that installing the upgrades was not an "8:00 to 5:00 job," and that he would often be working until midnight. Ruiz also acknowledged that Grossman came to the hangar to help complete some of the work. However, Ruiz explained that the plane stayed in his hangar for so long because of the country's COVID virus experience, he was diagnosed with cancer, his wife had health problems which required him to care for her, and he could not continuously work on the plane because he had to earn money by doing other projects.

By the time Grossman retook possession of the plane, Ruiz estimated that he had completed 90 percent of the project. Ruiz explained that he had double checked the

4.

wiring that he installed and found no faults, but he needed to install the radios/devices to do a final check of the system. Ruiz testified that Grossman had the new radios in his possession but would not return the radios despite Ruiz's requests. Ruiz believed that he did everything in his power to timely complete the upgrades and, considering COVID, his health, and his wife's health, there was nothing that he could have done to complete the upgrades faster. Ruiz believed that the 22 months that he had possession of the plane was a reasonable amount of time.

With respect to payment, Ruiz testified that he prepared invoices on April 15, 2022, which was after Grossman took the plane. Prior to the plane's repossession, FRA had not issued invoices for the project because Ruiz would not create invoices until after a job was done. The invoices were based on Ruiz's own experience in performing avionics work, the work actually performed, and his notes from working on the plane. Ruiz explained that the invoices were accurate, were not exaggerated, and were created for work that he actually performed on the plane. However, while the invoices accurately reflect the work actually performed, they did not reflect when the work was performed. The final invoices Ruiz gave to Grossman reflects the labor, parts, and services performed by Ruiz, the amounts owed by Grossman for the same, and credits for money already paid by Grossman; the net effect was that Grossman owed about $68,500. All but about $300 of the approximately $68,500 is for Ruiz's labor. Ruiz testified that all of the payments he had received from Grossman were used for parts and none of the money went to labor.

Finally, Ruiz testified that he sold aviation fuel as part of FRA's business at Chandler Airfield. Ruiz testified that he installed an aviation fuel station for about $191,500, he made between $10,000 and $40,000 per month in fuel sales (depending on the time of year), and that he lost about $258,000 in fuel sales as a result of his eviction. Ruiz testified that once he was evicted from Chandler Airfield, he also lost the ability to

sell aviation fuel. Ruiz testified that if Grossman had paid him for the work performed on the plane, Ruiz could have paid his rent and avoided eviction.

**B.** *Testimony of Grossman*.

Grossman testified that he had been taking his airplanes to respondents for avionics work since 2004. Up until this incident, Grossman believed that Ruiz did excellent work because Ruiz completed very complicated upgrades, and the upgrades worked as intended. In September 2020, Grossman testified that he visited FRA to see the progress on the plane. Although Grossman testified that he was dissatisfied with the progress of the project, he still agreed to additional upgrades because he had been Ruiz's customer for 20 years and Ruiz had previously done extensive upgrades very well. Thereafter, Grossman would occasionally come to the hangar to try to help Ruiz with the upgrades.

Eventually on January 19, 2022, Grossman sent Ruiz a letter in which he expressed his dissatisfaction with the slow pace of the upgrades and his belief that Ruiz was not actually working on the plane. Grossman stated that if Ruiz did not complete the panel wiring by January 28, 2022, then he would remove the plane. Grossman also testified that, just before he wrote this letter, he refused to bring the radios to FRA, despite Ruiz's requests, because he learned FRA was in danger of being evicted and he did not want to lose the radios in the eviction process. Grossman also believed that the plane was nowhere near being complete and was only in the preliminary stages of the upgrades.

Grossman filed a lawsuit against respondents on February 16, 2022, to get the plane back before FRA was evicted. Grossman felt defrauded because he believed Ruiz did not complete the upgrades, falsely represented that the plane was almost done, and took money in excess of the work actually performed. Grossman believed that when he paid Ruiz over $120,000, the checks included parts and labor.

6.

Through the litigation process, Grossman obtained the plane and the plane's uninstalled parts in March 2022 without paying FRA any further funds. Grossman did not realize how bad the plane was until after he retook possession. Grossman testified that it was decided that a new avionics firm would tear out everything that Ruiz had installed and start the project from scratch.

**C.    *Testimony of William Newburn*.**

William Newburn testified on behalf of Grossman as an avionics expert. Newburn owned two separate business, an avionics business and an aviation mechanics business, both of which were certified by the FAA and both of which operated out of Chandler Airfield. Newburn consented to taking over the avionics upgrades on the plane after he learned that FRA was going out of business.

Newburn began working parttime on the plane sometime in 2022. When Newburn first saw the plane, which was after it had been towed away from FRA's hangar, he believed that nothing was completed and that the work was not far enough along that Ruiz would need the avionics devices/radios for a final test. Newburn described some of the work he did on the plane and described photographs that depicted the condition of the plane, either when the plane was received or after he had done some work on it. Newburn testified that, due to the difficulty of understanding Ruiz's installation scheme, he had to create new schematics. In the course of his evaluation of and work with the plane, Newburn found 22 issues with Ruiz's work. Newburn described each issue to the jury. After consultation with Grossman and an aviation mechanic (James Wood), it was agreed that all of Ruiz's work should be pulled out and the project restarted because of safety and liability concerns. Newburn described the items, equipment, tasks, and labor on the work orders he prepared for Grossman. Newburn testified that he would charge Grossman $140 per hour for labor, and that it was estimated that the job would require 480 hours of labor to complete. Newburn also explained that, given the scope of the

7.

upgrades requested, there could be "a couple thousand different parts" involved, and there could be between 500 and 1,000 steps in the process of installing the upgrades.

Newburn testified that he had been familiar with Ruiz's work and some of it had been exceptional, but he was extremely surprised by Ruiz's work on the plane. Newburn also testified that several items charged by FRA on the invoices were not actually performed. Newburn confirmed that there were existing harnesses in the plane and, to actually make final tests and inspections of the harnesses, wiring, and systems, the radios/avionics devices needed to be installed into the harness and hooked up to the wiring.

### D. *Testimony of Marty Bevill*

Grossman called Marty Bevill as a witness. Bevill subleased office space from Ruiz for Bevill's flight school in the FRA hangar from 2014 to September 2020. Bevill occasionally observed Ruiz work on airplanes, but not very often, and it did not appear that anything was being done with the plane. Bevill did acknowledge that he was often out flying and training people, and that he would only be in the office about 45 minutes to an hour each day. Bevill also acknowledged that Ruiz did really good work. On the last day at FRA's hangar, Bevill called Grossman, who was also Bevill's client. Bevill told Grossman that the plane was in a museum, and if he wanted the work done, he needed to take the plane away from FRA.

### E. *Testimony of James Wood.*

Grossman called James Wood as an expert witness in the area of service repair and inspection of general aircraft but not as an expert in avionics. Wood owned an aviation shop that performed aviation mechanical work. Wood had done mechanical inspections and maintenance on Grossman's airplanes for 11 years. Wood had inspected airplanes in which Ruiz had performed work and believed that Ruiz's work was "fine." Wood believed that the plane was the only one in which Ruiz's work did not meet expectations. Wood regularly looked at the plane while it was in the FRA hangar because Wood

wanted to get money for the plane's annual inspection and because Grossman asked him to do so. Wood believed that the instrument panel looked horrible and as if the plane had been in a crash. Wood encouraged Ruiz to work on the plane, but whenever Wood went to FRA and looked at the plane, it looked like nothing had been done and wires were everywhere. Further, Wood removed the plane from FRA's hangar at Grossman's request, and when he did so, he believed the work was very incomplete because the instrument panel was still out, there were wires everywhere, and the interior was removed. Wood described the mechanical work and labor costs to restore the plane in light of its current condition. Wood also testified that the avionics upgrades for the plane were "very large" and that it would be like converting a 1957 Chevy into a 2024 Tesla.

### F. *Rebuttal Testimony of Ruiz.*

On rebuttal, Ruiz agreed that he had installed thousands of parts and pieces before the plane was removed from FRA. Ruiz then addressed the 22 issues identified by Newburn and described more specific aspects of the work he had performed on the plane. Ruiz generally explained that the 22 issues were either very minor, involved end of project work that he had been unable to do, or were temporary measures that were to be corrected at the completion of the project. Ruiz also noted that he did not charge for work that he (as opposed to a helper) did not personally perform.

## DISCUSSION

## I. Admission of Invoices.

### A. *Parties' arguments.*

Grossman argues that the trial court erred by overruling his hearsay objection and admitting FRA's invoices, which were exhibits 103, 123, 140, and 143. Grossman argues that Ruiz's deposition and trial testimony demonstrated that FRA could not meet any elements of the business records exception to hearsay. Grossman argues that the court's error was prejudicial because the invoices were untrustworthy and, without them, there was no way to determine how much was owed for the work allegedly performed by FRA.

Respondents argue exhibits 103, 123, and 143 were admitted by stipulation. Because of the stipulation, respondents argue that Grossman has forfeited any error. With respect to exhibit 140, respondents contend that the exhibit was provisionally admitted. Because Grossman did not reassert his objection, respondents argue that any issue regarding admissibility has been waived. Alternatively, respondents argue that any error associated with exhibit 140 was harmless.

**B.      *Additional background.***

Grossman's motion in limine number 3 ("GMIL 3") attempted to exclude FRA's invoices. GMIL 3 argued that FRA's invoices were hearsay, and that FRA could not meet the business records exception to the hearsay rule. After reviewing the parties' briefs, the trial court made the following ruling: "Number 3, exclude [FRA's] invoices as inadmissible hearsay. That is denied. I do believe the documents are minimally trustworthy and we'll leave it to the jury to assess trustworthiness. [GMIL 3] is denied."

The day after the trial court ruled on the motions in limine, the parties entered into a stipulation in open court. The court explained its understanding that the parties wished "to put on the record a stipulation regarding the admissibility of exhibits…." FRA's counsel answered affirmatively and explained: "We have a joint exhibit list consisting of 139 exhibits. We have provided it to the clerk and the Court. The parties stipulate that Exhibits 101, 103, 104, 105, 109, 110, 111, 112, 116, 117, 119, 121, 122, 123, 124, 125, 128, 130, 135, to be admitted into evident without further foundation, et cetera." Exhibits 103 and 123 consist of FRA's invoices. When asked if any correction was needed, Grossman's counsel identified only exhibit 106 as also being subject to the stipulation.

During trial, the parties stipulated to the admission of exhibit 143. Grossman's counsel characterized exhibit 143 as an invoice that was left out of exhibit 103. The trial court accepted the parties' stipulation to admit exhibit 143.

Also, during trial, respondents admitted exhibit 140. Exhibit 140 is as single page exhibit that reflected the alleged interest owed by Grossman on outstanding balances.

10.

Exhibit 140 is dated January 8, 2024, and was created that day by Ruiz. When respondents attempted to enter exhibit 140 into evidence, Grossman's counsel objected to a lack of foundation. The court ruled that exhibit 140 was "provisionally received in evidence subject to cross-examination." Grossman did not reassert any objections to exhibit 140.

### C. *Legal standard*.

"Hearsay is an out-of-court statement offered to prove the truth of its content." (*People v. Valencia* (2021) 11 Cal.5th 818, 831, fn. omitted; *Cameron v. Las Orchidias Properties, LLC* (2022) 82 Cal.App.5th 481, 511; see also § 1200.) "Hearsay is inadmissible unless it falls under [a statutory] exception." (*People v. Ng* (2022) 13 Cal.5th 448, 539; *Bowser v. Ford Motor Co.* (2022) 78 Cal.App.5th 587, 610.) One exception to the hearsay rule is the business records exception. (§ 1271; *People v. Turner* (2020) 10 Cal.5th 786, 822; *People v. Hovarter* (2008) 44 Cal.4th 983, 1010–1011; *Jones v. Solgen Construction, LLC* (2024) 99 Cal.App.5th 1178, 1189 (*Jones*).) To meet the business records exception, the proponent of the evidence must establish that: (1) the writing was made in the regular course of business; (2) the writing was made at or near the time of the act, condition, or event; (3) the custodian or other qualified witness testifies to its identity and the mode of its preparation; and (4) the sources of information and mode and method and time of preparation indicate trustworthiness. (§ 1271; *Hovarter*, at pp. 1010–1011; *Jones*, at p. 1189.)

A trial court's rulings on hearsay exceptions are reviewed for an abuse of discretion. (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 766; *Jones*, *supra*, 99 Cal.App.5th at p. 1189.) If an abuse of discretion is found, the evidentiary error will be reversible only if " 'it is reasonably probable that a result more favorable to [appellant] would have been reached in absence of the error.' " (*Hrnjak v. Graymar, Inc.* (1971) 4 Cal.3d 725, 734 (*Hrnjak*); *Qaadir v. Figueroa* (2021) 67 Cal.App.5th 790, 805.) "Probability" under section 352 " ' "does not mean more likely than not, but merely a

*reasonable chance*, more than an *abstract possibility*." ' " (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 (*Cassim*); *Yaffee v. Skeen* (2024) 106 Cal.App.5th 1281, 1307 (*Yaffee*).)

### D. *Analysis*.

#### 1. Exhibit 140.

Exhibit 140 does not purport to be an invoice. Instead, it is entitled "Finance Charge" and calculates the finance/interest charges for Grossman's overdue balances. Because exhibit 140 is dated, and was created on, January 8, 2024, it postdates both GMIL 3 and all other documents that are expressly identified as invoices. Given that exhibit 140 is not per se an invoice, and because it postdates the motions in limine, we are not satisfied that exhibit 140 was within the scope of either GMIL 3 or the trial court's ruling thereon. Therefore, as an exhibit that was outside the scope of GMIL 3, it was incumbent upon Grossman to object to the admission of exhibit 140 on the same grounds urged in this appeal. (*People v. Jasso* (2025) 17 Cal.5th 646, 674; *St. John v. Schaeffler* (2025) 109 Cal.App.5th 1146, 1166.) However, Grossman's counsel objected only that exhibit 140 lacked foundation; she did not object that exhibit 140 was hearsay. Because Grossman did not make a hearsay objection to the trial court, he has forfeited the issue on appeal. (*Jasso*, at p. 674; *St. John*, at p. 1166.)

#### 2. Exhibit 143.

Assuming without deciding that exhibit 143 is inadmissible hearsay, we detect no harm from its admission. Exhibit 143 is a single page invoice dated November 20, 2021, for work performed on the plane's tail beacon. The invoice shows that $3,976.58 was the total amount charged but also shows that Grossman paid that amount. In other words, exhibit 143 is a zero-balance invoice that reflects Grossman owed nothing for the work reflected therein. Because exhibit 143 does not itself reflect a balance owed, it is entirely unknown how the admission of exhibit 143 could have resulted in a better result for Grossman or otherwise harmed him. Therefore, we conclude that admission of exhibit

12.

143 was harmless.  (*Cassim*, *supra*, 33 Cal.4th at p. 800; *Hrnjak*, *supra*, 4 Cal.3d at p. 734; *Yaffee*, *supra*, 106 Cal.App.5th at p. 1307.)

### 3. Exhibits 103 and 123.

#### a. *Forfeiture*.

A motion in limine to exclude testimony at trial that is denied will preserve the issue for appellate review if:  the specific legal ground for exclusion is stated, the motion is directed at a particular piece of evidence, and the motion is made at a time when the trial court can determine the evidentiary question in context.  (*People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1; see *People v. Thompson* (2016) 1 Cal.5th 1043, 1108–1109). We agree with Grossman that GMIL 3 meets these criteria with respect to an objection that the invoices of exhibits 103 and 123 ("the invoices") are inadmissible hearsay that do not meet the business records exception.  The issue is complicated, however, by Grossman's stipulation without caveats for the admission of the invoices because it is well established that a stipulation precludes a party from raising objections relating to that stipulation.  (*People v. Gurule* (2002) 28 Cal.4th 557, 623.)

With little analysis, our Supreme Court has indicated that a stipulation for the admission of evidence after an objection thereto is denied does not forfeit or waive the objection.  (*Acosta v. Southern California Rapid Transit Dist.* (1970) 2 Cal.3d 19, 25.) But in a more recent case, our Supreme Court concluded that whether a stipulation precluded a party from raising a previously overruled objection was "a close question," but ultimately one that did not need to be answered because the admission of the evidence at issue was harmless.  (*People v. Gurule*, *supra*, 28 Cal.4th at pp. 623–624.) Because we conclude that the admission of the invoices was harmless, we follow *Gurule* and decline to determine whether the stipulation precludes Grossman from challenging the admissibility of the invoices.  (*Ibid.*)

### b. *No harm from the admission of the invoices.*

It has been recognized that the use of invoices to prove either liability for repairs/services incurred, a payment was made, a charge was reasonable, or specific repairs were actually made is improper because invoices generally constitute hearsay. (*Pacific Gas & Electric Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 42–43 (*PG&E*); see also *Mai v. HKT Cal, Inc.* (2021) 66 Cal.App.5th 504, 520–521.) If a party wishes to use an invoice alone to prove any of these matters, then the party must establish an exception to the hearsay rule. (*PG&E*, at p. 43 & fn. 10.) In this case, we will assume without deciding that Ruiz's testimony regarding the invoices was insufficient to establish the business records exception. It is then left for Grossman to establish that he was prejudiced by the admission of the invoices. (*Hrnjak*, *supra*, 4 Cal.3d at p. 734.) Two considerations lead us to believe that Grossman has not met his burden.

First, Ruiz's testimony contains significant information that was also contained within the invoices. Ruiz testified that he charged $142.50 for his labor, that none of the amounts he had received from Grossman were for labor, and that he was owed $68,509.59 for "the value of the work" that he had performed on the plane. By dividing approximately $68,500 by $142.50 per hour, Ruiz's testimony shows that he was seeking compensation for approximately 480 hours of work. Newburn was charging Grossman $140 per hour for 480 hours of work to install the plane's upgrades. It is true that Ruiz did not address every specific line item or project that made up the $68,500 figure. Nevertheless, in addition to identifying the total sum due and the hourly rate, Ruiz testified extensively about the nature of the work that he performed in attempting to install the avionics upgrades. He described parts that he ordered, parts and schematics that he made, and wiring, parts, and equipment that he uninstalled, installed or moved, and that the process involved the installation of thousands of parts and pieces. This testimony was consistent with Newburn's description of the installation process. Ruiz's

14.

testimony provided context and a frame of reference for the jury to consider what work Ruiz had actually performed on the plane. We think that these aspects of Ruiz's testimony were a sufficiently substantial foundation upon which the jury could base its damages award. Because Ruiz's testimony constitutes substantial evidence in support of the damage award, and because it contains significant aspects of the information that was also found in the invoices, we concluded that it is not sufficiently probable that Grossman was harmed by the admission of the invoices. (See *Cassim*, *supra*, 33 Cal.4th at p. 800; *Hrnjak*, *supra*, 4 Cal.3d at p. 734; *Dietl v. Heisler* (1961) 188 Cal.App.2d 358, 370–371 [finding the admission of 80 invoices over a hearsay objection was harmless when the subcontractors who performed the work in question and who prepared the invoices testified about most of the information contained within the invoices].)

Second, after the jury found that Grossman had breached his agreement to pay FRA for the work performed by Ruiz, the jury had to consider damages. During closing arguments, FRA asked the jury to award it approximately $530,000 in damages based on the $68,500 owed for services rendered, $26,000 in interest on the outstanding balances owed, $248,000 in lost fuel revenues, and about $191,500 for the value of the fuel station. While the jury obviously believed Ruiz because they found in favor FRA on both of its claims and against Grossman on all his claims, the jury did not find that FRA had met its burden with respect to the damages claimed. Instead of $530,000, the jury awarded $24,000, which is roughly five percent of what FRA requested. Because the jury found Ruiz to be the more credible party/witness and found entirely against Grossman, we cannot envision a result more favorable to Grossman than an award of damages that was only five percent of what was requested, irrespective of the admission of the invoices. (*Cassim*, *supra*, 33 Cal.4th at p. 800; *Hrnjak*, *supra*, 4 Cal.3d at p. 734; *Yaffee*, *supra*, 106 Cal.App.5th at p. 1307.)

In sum, because Ruiz's testimony reflected significant aspects of the invoices at issue and was sufficiently substantial to support an award of damages, and because the

15.

jury only awarded FRA five percent of the damages it was seeking, there is no reasonable probability that Grossman would have obtained a better result if the invoices had been excluded. (*Cassim*, *supra*, 33 Cal.4th at p. 800; *Hrnjak*, *supra*, 4 Cal.3d at p. 734; *Dietl v. Heisler*, *supra*, 188 Cal.App.2d at pp. 370–371.) Therefore, admission of the invoices was harmless. (*Cassim*, at p. 800; *Dietl*, at pp. 370–371.)

## II. JNOV

### A. *Parties' Arguments*.

Grossman argues that the trial court erred by not granting his motion for JNOV because substantial evidence did not support the jury's verdict. Grossman argues that the only evidence that established a breach by him was the inadmissible invoices and Ruiz's own self-serving testimony. Grossman also argues that Ruiz's testimony in general was rife with inconsistencies and trustworthiness concerns and, thus, cannot constitute reasonable or substantial evidence.

Respondents contend that the trial court properly denied Grossman's motion because the documentary and testimonial evidence established all the necessary elements of a breach of contract.

### B. *Legal standards*.

A JNOV is appropriately granted " ' "if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." ' " (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 192; *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 (*Sweatman*).) Like the trial court, reviewing courts determine "whether any substantial evidence— contradicted or uncontradicted—supports the jury's conclusion." (*Sweatman*, at p. 68; see *Webb*, at p. 192.) Substantial evidence is " ' "such evidence as a reasonable fact trier might accept as adequate to support a conclusion; evidence which has ponderable legal significance, which is reasonable in nature, credible and of solid value." ' " (*Elation Systems, Inc. v. Fenn Bridge LLC* (2021) 71 Cal.App.5th 958, 964; see also *Kruthanooch*

16.

*v. Glendale Adventist Medical Center* (2022) 83 Cal.App.5th 1109, 1122 (*Kruthanooch*).)

Reviewing courts may not reweigh the evidence or judge the credibility of witnesses. (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110 (*Hauter*); *Elation Systems*, at p. 964.) Courts resolve conflicts in the evidence, and draw all reasonable inferences therefrom, in favor of the jury's verdict. (*Kruthanooch*, at p. 1122; see also *Hauter*, at p. 110; *Ena North Beach, Inc. v. 524 Union Street* (2019) 43 Cal.App.5th 195, 210.) " 'If there is any substantial evidence, or reasonable inferences to be drawn therefrom, the [JNOV] motion should be denied.' " (*Hauter*, at p. 110; *Ena North Beach*, at p. 210.)

## C. *Analysis*.

### 1. Breach of contract.

The elements of breach of contract are: " '(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach.' " (*Naranjo v. Doctors Medical Center of Modesto, Inc.* (2025) 111 Cal.App.5th 408, 430.)

Resolving all conflicts in favor of the verdict (*Kruthanooch*, *supra*, 83 Cal.App.5th at p. 1122) and viewing the evidence in the light most favorable to the verdict (*Sweatman*, *supra*, 25 Cal.4th at p. 68), we are satisfied that there was substantial evidence to satisfy each element of a breach of contract cause of action. First, there is no dispute that Grossman and Ruiz entered into an agreement whereby FRA would perform major avionics upgrades on the plane and Grossman would pay FRA's costs in making the upgrades, including labor costs.[4] Therefore, a contract existed between FRA and Grossman. Second, Ruiz gave extensive testimony regarding the work that he performed on the plane as part of the upgrade process. Ruiz designed schematics, obtained new parts and equipment, removed or moved old equipment and different parts of the plane,

---

[4] We note that the agreement was reflected in two written bids that were submitted in evidence, as well as other modifications between FRA and Grossman that were outside of the two bids received in evidence.

17.

made new equipment from scratch, installed new wiring, and installed thousands of parts and pieces. This was partially confirmed by the testimony of Grossman, who acknowledged that some work had been done on the plane, and by the expert testimony of Newburn, who acknowledged that Ruiz had done work on the plane. Ruiz also opined that he had tested his work to the extent that he could, and he was about 90 percent done with the project.[5] It is true that Ruiz did not complete the upgrades as agreed, but he was in the process of doing so when Grossman retook possession of the plane. Further, Ruiz testified he did all he could to timely complete the upgrades and the time he was taking to install the upgrades was reasonable. Therefore, the evidence shows that Ruiz was in the process of timely and properly performing his obligations under the agreement but was excused from full performance because of the actions of Grossman. Third, Ruiz testified that Grossman did not pay any amounts for labor and had an outstanding balance for labor and some parts and equipment. Therefore, the evidence showed that Grossman breached the agreement by not paying for all aspects of the upgrades that were completed when the plane was retaken. Fourth, and finally, Ruiz testified that Grossman owed about $68,500 for the work performed and owed about $26,000 in interest. Ruiz also testified that he lost his aviation fuel equipment that was valued at about $191,500 and lost about $258,000 in fuel sales as a result of Grossman's failure to pay the balance owed. Although the damages awarded were far less than the amount requested by FRA,

---

[5] Grossman's briefing points out the trial court never designated Ruiz as an expert. However, Grossman never objected that Ruiz was unqualified to give expert opinions regarding avionics. "[W]hile … sections 720, subdivision (a), and 802 provide that the person testifying as an expert must be qualified by special knowledge, skill and experience, these foundational requirements need not be established in the absence of a *specific* objection or unless the court, in its discretion, requires it." (*People v. Rodriquez* (1969) 274 Cal.App.2d 770, 776; see also *People v. Bolin* (1998) 18 Cal.4th 297, 321.) By failing to object, Grossman forfeited the issue of Ruiz's expertise. Moreover, Ruiz's more than 60 years of installing avionics equipment indisputably qualified him to render expert opinions. Even Grossman's counsel elicited testimony from Grossman that he trusted Ruiz because Ruiz was an expert. Therefore, even if the issue has not been forfeited, the failure to formally recognize Ruiz as an expert was harmless.

18.

the amount of damages is a fact question that is committed to the discretion of the trier of fact. (*Sanguinetti v. Moore Dry Dock Co.* (1951) 36 Cal.2d 812, 819; *IIG Wireless, Inc. v. Yi* (2018) 22 Cal.App.5th 630, 648.) The jury clearly believed that FRA was damaged, but simply not to the extent Ruiz claimed. Therefore, the evidence showed that FRA was damaged by Grossman's breach.

Grossman highlights what he believes to be inconsistencies within Ruiz's testimony and with other evidence. However, assuming that each instance identified is in fact an inconsistency in Ruiz's testimony, this does not aid Grossman. Substantial evidence need not be uncontradicted (*Sweatman*, *supra*, 25 Cal.4th at p. 68), and the fact that there are inconsistencies in a witness's testimony does not mean that the testimony has no evidentiary value or cannot constitute substantial evidence. (*Clemmer v. Hartford Ins. Co.* (1978) 22 Cal.3d 865, 878 (*Clemmer*); see also *People v. Collins* (2021) 65 Cal.App.5th 333, 345.) The jury was free to resolve any inconsistencies in Ruiz's testimony as they saw fit. (*Clemmer*, at p. 878; *People v. Cartwright* (1980) 107 Cal.App.3d 402, 417; see also *Collins*, at p. 345.) It is apparent that the jury largely rejected the testimony of Grossman, Newburn, and Wood, and instead believed Ruiz and thus, resolved the inconsistencies in Ruiz's favor. " '[T]he testimony of a witness whom the trier of fact believes, whether contradicted or uncontradicted, is substantial evidence,' " and we will defer to the jury's determination that Ruiz was the more credible witness. (*Lone Star Security & Video, Inc. v. Bureau of Security & Investigative Services* (2012) 209 Cal.App.4th 445, 458, quoting *Estate of Odian* (2006) 145 Cal.App.4th 152, 168.)

Grossman also contends that Ruiz's testimony should be discounted as self-interested and self-serving. By its very nature, a party's testimony will most likely be "self-serving" to some degree, but that does not make the testimony false or of no value. It is well established that "the testimony of a single witness, *even a party*, may alone constitute substantial evidence." (*Chase v. Wizmann* (2021) 71 Cal.App.5th 244, 257,

italics added; see *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)  Thus, even if no other evidence supported FRA's breach of contract claim, Ruiz's testimony alone would constitute substantial evidence irrespective of his status as a party.  (*Mix*, at p. 614; *Chase*, at p. 257; see also *Clemmer*, *supra*, 22 Cal.3d at p. 878.)

In sum, because substantial evidence supported the jury's verdict, the trial court correctly denied Grossman's motion for JNOV.  (*Hauter*, *supra*, 14 Cal.3d at p. 110.)

### 2. Quantum meruit.

#### a. *Substantial evidence*.

Quantum meruit is the principle that the law will imply " ' "a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered." ' "  (*Port Medical Wellness, Inc. v. Connecticut General Life Insurance Co.* (2018) 24 Cal.App.5th 153, 180.)  The elements of the common count of goods and services rendered/quantum meruit are:  (1) the defendant requested, by words or conduct, that the plaintiff perform services/deliver goods for the benefit of the defendant; (2) the plaintiff performed the services/delivered the goods as requested; (3) the defendant did not pay for the services or goods; and (4) the reasonable value of the services or goods.  (CACI 371; see also *Port Medical Wellness*, at p. 180 [distilling the elements to:  (1) the provision of services at the request of the defendant, and (2) the services conferred a benefit on the defendant].)

Here, for essentially the same reasons as explained with respect to the breach of contract claim, we have no trouble concluding that substantial evidence supports each element of quantum meruit.  First, Grossman asked FRA to install upgrades in the plane.  The upgrades would have improved the performance of the plane and obviously would be beneficial to Grossman.  While it is true that the upgrades were not completed, Ruiz's testimony shows that he was performing reasonably and that he was 90 percent done with the project.  The jury could have reasonably concluded that performing 90 percent of extensive upgrades, which according to one witness was like converting a 1957 Chevy

20.

into a 2024 Tesla, conferred a benefit on Grossman. Second, Ruiz's testimony establishes that he performed substantial work on the plane as part of the upgrade process. Third, Ruiz's testimony established that Grossman had not paid for all services rendered, particularly labor costs. Fourth, Ruiz testified that Grossman owed about $68,500 for services rendered. Ruiz also testified as to the hourly rate he was owed for his labor and gave extensive testimony regarding the work he performed. While the jury did not award Ruiz $68,500, the jury considered all witnesses' testimony and awarded an amount that did not exceed the $68,500 figure.

Grossman points to inconsistencies in Ruiz's testimony and to the testimony of Newburn and Wood that Ruiz's upgrades were unusable and not up to FAA standards. However, the jury was free to, and clearly did, resolve any inconsistencies in Ruiz's testimony in his favor. (*Clemmer*, *supra*, 22 Cal.3d at p. 878.) Further, Ruiz testified that he had tested his work (to the extent he could without the radios/devices) to make sure it had been done correctly. The jury was free to credit his testimony and reject the testimony of Newburn and Wood (*Chase v. Wizmann*, *supra*, 71 Cal.App.5th at p. 257; *Lone Star Security & Video, Inc. v. Bureau of Security & Investigative Services*, *supra*, 209 Cal.App.4th at p. 458), which it clearly did. We defer to those determinations.

In sum, viewing the evidence in the light most favorable to the verdict (*Sweatman*, *supra*, 25 Cal.4th at p. 68), making all reasonable inferences in favor of the verdict, and resolving all inconsistencies in favor of the verdict (*Kruthanooch*, *supra*, 83 Cal.App.5th at p. 1122), we conclude that substantial evidence supports the verdict in favor of FRA. (*Hauter*, *supra*, 14 Cal.3d at p. 110.)

**b.** *Improper recovery.*

Relying on *Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410 (*Hedging Concepts*), Grossman argues in his opening brief that the trial court erred by allowing FRA to recover on the quantum meruit cause of action. For several reasons, we are not satisfied that Grossman is entitled to relief.

21.

First, respondents' brief argued that Grossman forfeited the issue by not raising it to the trial court.  Grossman's reply brief did not address respondents' argument or the quantum meruit claim in any respect.  The failure of Grossman to address respondents' argument, to reassert his prior argument, or to even mention quantum meruit in his reply brief appears to be either a concession to respondents' argument or an abandonment of the issue.  (*People v. Hightower* (1996) 41 Cal.App.4th 1108, 1112, fn. 3; *Campbell v. Ingram* (1918) 37 Cal.App. 728, 732 ["Since appellant has not designed to reply to the argument of respondent, we have a right to assume that the former deems the argument of the latter unanswerable …."].)

Second, *Hedging Concepts* stands for the proposition that a common count based on an implied contract cannot be used to obtain a recovery if the common count implies terms that are contrary to an express contract.  (See *Hartford Casualty Ins. Co. v. J.R. Marketing, L.L.C.* (2015) 61 Cal.4th 988, 1001 [distinguishing *Hedging Concepts* because the appellant's claims for reimbursement did "not contravene or alter any term" of express contracts]; *Newport Harbor Ventures, LLC v. Morris Cerullo World Evangelism* (2016) 6 Cal.App.5th 1207, 1222 [citing *Hedging Concepts* for the proposition that a "[q]uantum meruit recovery that is contrary to an express contractual term is not allowed"]; see also *Hedging Concepts*, *supra*, 41 Cal.App.4th at p. 1419 [finding error in the use quantum meruit to imply a contractual term that would be contrary to a term of the express contract at issue].)  Grossman does not explain what terms of the parties' contract are altered or contravened by FRA's quantum meruit claim.

Third, if a contract has been executed by a plaintiff, and all that remains to be done under the contract is the payment of money by the defendant, the plaintiff is not precluded from pursuing a common count claim.  (*Ferro v. Citizens Nat'l Trust & Savings Bank* (1955) 44 Cal.2d 401, 409; *Castagnino v. Balletta* (1889) 82 Cal. 250, 258.)  This rule applies when the plaintiff cannot complete his obligations under the contract because the actions of the defendant prevents him from doing so.  (*Rains v.*

22.

*Arnett* (1961) 189 Cal.App.2d 337, 343–344.)  Here, Grossman's actions in retaking possession of the plane prevented Ruiz from completing the upgrades that Grossman and FRA had agreed upon.  Once Grossman retook possession of the plane, the only thing left to do under the agreement was for Grossman to pay FRA for the work performed by Ruiz.  *Ferro*, *Castagnino*, and *Rains* indicate that FRA could pursue a claim for quantum meruit.

Finally, under certain circumstances, appellate courts may disregard the findings of a trier of fact as to one claim when the judgment can be upheld on the basis of another claim.  (*Crogan v. Metz* (1956) 47 Cal.2d 398, 403; *Baird v. Ocequeda* (1937) 8 Cal.2d 700, 703; *Zinn v. Fred R. Bright Co.* (1969) 271 Cal.App.2d 597, 604.)  Here, the verdict form asked two sets of liability questions, one regarding the breach of contract claim and the other involving the quantum meruit claim.  The verdict form directed the parties to answer one damages question if they answered yes to the liability questions under either of these two claims.  The damages question was a general question because it did not differentiate between the types of damages sought or the specific damages for the two claims.  The jury answered all liability questions in favor of FRA on the breach of contract and quantum meruit claims.  The jury then properly answered the general damages question with a single lumpsum notation of $24,000.  Further, as explained above, we have determined that substantial evidence supported the jury's verdict with respect to FRA's breach of contract claim and quantum meruit claims, including with respect to the element of damages.  A review of the closing arguments confirms that the basis for the two causes of action were the same — Ruiz performed avionics work at Grossman's request and was not fully paid for the work.  Under these circumstances, we may appropriately disregard the jury's finding with respect to quantum meruit.  (*Crogan*, at p. 403; *Baird*, at p. 703; *Zinn*, at p. 604.)

For these reasons, we conclude that Grossman has failed to meet his burden of demonstrating reversible error.  (*Walling v. Kimball* (1941) 17 Cal.2d 364, 373 [noting

23.

that "an appellant has the burden of showing reversible error …"]; *Alafi v. Cohen* (2024) 106 Cal.App.5th 46, 62 [same].)

## III. Admissibility of Witness Richard Paivana's Testimony.

### A. *Parties' arguments*.

Grossman argues the trial court erred by excluding the testimony of Richard Paivana (Paivana). Grossman argues that Paivana. would have testified that Ruiz failed to use due care in repairing Paivana's airplane, fraudulently induced Paivana into a contract, and then sued Paivana for failing to pay for repairs that FRA never actually made. Grossman contends that this testimony would not have been unduly prejudicial but instead would show the noncharacter purposes of establishing a common plan or design and the absence of a mistake by Ruiz. Grossman also argues that the record does not reflect that the court actually weighed the probative value of the Paivana's testimony against any undue prejudice. Grossman contends that the exclusion of Paivana's testimony was prejudicial.

Respondents appear to argue that Grossman has forfeited this issue because Grossman did not attempt to call Paivana to testify and make an offer of proof at trial, despite the trial court giving him permission to do so.

### B. *Additional background*.

In relevant part, FRA's motion in limine number 8 ("FMIL 8") sought to exclude the testimony of Paivana under section 352 and because Paivana's testimony would amount to character evidence. Paivana was a former client of FRA who was involved in litigation with FRA for avionics work on Paivana's airplane. Grossman's opposition to FMIL 8 explained that Paivana would testify to improper conduct by Ruiz that was the same as the improper conduct by Ruiz against Grossman. Grossman argued that Paivana's testimony would negate any claim of "mistake" and establish a common plan or design by respondents. The court made the following ruling and had the following exchange with Grossman's counsel:

24.

"Court: [FMIL 8], disallow testimony by or about [the Paivana] matter. We're not going to try the [Paivana] matter in this case. The Court doesn't want to hear much of any evidence about his dispute with [FRA] or [Ruiz]. And to the extent it has any relevance, I'm exercising my discretion under Evidence Code section 352 to exclude it. So not much of any evidence about [Paivana].

"Counsel: So excluding his testimony, just so I understand, in whole or can we provide an offer of proof that we show limitations that the information we're seeking from him?

"Court: That would be fine, but I don't want to get [Paivana] on the stand to crap on [Ruiz] and talk about bad work and why he withheld payment and all that to basically use it for [Grossman] to prevail in his case. I don't want to get into the weeds of the [Paivana] dispute. I want to talk about what work was done on the [Grossman's plane] and whether or not it was paid, whether or not payment was withheld for a reason. I want to talk about this case. These claims. Not [Paivana] and his claims.

[¶ … ¶]

"Court: [Grossman] can make an offer of proof. You call him and let me know outside the presence of the jury what he's expected to testify it and I'll either greenlight it or sustain it.

"Counsel: Sounds fair, Your Honor. Thank you."

Grossman did not attempt to call Paivana to testify and made no further offers of proof.

## C. *Legal standard.*

Section 352 enables trial courts to exclude otherwise admissible evidence. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 808; *People v. Wheeler* (1992) 4 Cal.4th 284, 290.) Under section 352, a trial court has the discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time, or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352; *People v. Helzer* (2024) 15 Cal.5th 622, 667; *People v. Miles* (2020) 9 Cal.5th 513, 587 (*Miles*).) "Prejudice" under section 352 is not the same as "damaging;" rather, "prejudice" means " 'evidence that uniquely tends to evoke an emotional bias against the defendant as an

25.

individual, and has little to do with the legal issues raised in the trial.' " (*Miles*, at p. 587; see also *Helzer*, at p. 667.) Trial courts enjoy broad discretion under section 352. (See *Helzer*, at p. 667; *Miles*, at p. 587.) As such, a trial court's decisions under section 352 are reviewed under the abuse of discretion standard. (*Helzer*, at p. 667; *Miles*, p. 587.) A trial court may abuse its discretion when it acts in an arbitrary, capricious, or absurd manner that results in a miscarriage of justice (*Miles*, at p. 587), or when its ruling is outside the bounds of reason under the circumstances (*People v. Johnson* (2022) 12 Cal.5th 544, 605 (*Johnson*)). " 'A merely debatable ruling cannot be deemed an abuse of discretion.' " (*Ibid.*; *Jones*, *supra*, 99 Cal.App.5th at p. 1203.)

### D.     *Discussion.*[6]

The trial court's oral ruling reflects two reasons why Paivana's testimony was excluded under section 352: the court did not want to spend trial time exploring the dispute between respondents and Paivana, and the court did not want Paivana to simply disparage Ruiz. Thus, the court's ruling invokes both bases for exclusion under section 352, the danger of an undue consumption of time under subdivision (a) and the danger of undue prejudice under subdivision (b). (§ 352.)

With respect to an undue consumption of time under section 352, subdivision (a), we conclude that the trial court's concern was justified. The amount of expert and technical testimony with respect to the case between respondents and Grossman was substantial and time consuming. Ruiz testified extensively about the kind and nature of the work he performed on the plane, as well as his billing for that work. Grossman attempted to counter that testimony with his own testimony and the testimony of an

---

**6**     We are not persuaded by respondents' forfeiture argument. Grossman explained what Paivana's testimony would be and why it was admissible, and the trial court excluded the evidence. Grossman makes the same arguments for admission to us as he did before the trial court. Given the court's ruling and the purpose of Paivana's testimony, we think that a further objection or offer of proof would have been futile. (*People v. Gomez* (2018) 6 Cal.5th 243, 287.) Therefore, Grossman has not forfeited the issue of Paivana's testimony.

26.

avionics expert (Newburn) and an aviation mechanics and inspection expert (Wood). If Paivana were permitted to testify about the circumstances of his case, similar types of testimony would be presented. Specifically, Paivana would have to explain what work he had respondents perform, what work respondents actually performed, why the work was not satisfactory, and why he withheld payment. Respondents would then be given the opportunity to address or counter Paivana's testimony. Ruiz could explain what was or was not agreed to, why it took the amount of time it did to complete the job, how and why he performed the work that he did and defend and explain the quality of his work and the accuracy of his billing. The danger of confusion and having a "mini-trial" on the work performed for, and the dispute with, Paivana is self-evident. (See *People v. Hamilton* (2009) 45 Cal.4th 863, 930 [finding no abuse of discretion for excluding testimony under section 352, subdivision (a) because there was a danger of creating a "mini-trial"]; *People v. Woods* (2025) 109 Cal.App.5th 985, 1001 [same].) We cannot conclude that the court's concern about the danger of undue time consumption was so arbitrary or beyond the bounds of reason that it constitutes an abuse of discretion. (*Johnson*, *supra*, 12 Cal.5th at p. 605; *Miles*, *supra*, 9 Cal.5th at p. 587.)

As to undue prejudice under section 352, subdivision (b), the trial court was concerned that Paivana's testimony would simply disparage Ruiz. Grossman's opposition to FMIL 8 indicated that Paivana would testify that Ruiz did poor quality work, charged for work that was not actually performed, did not finish the job, and sued Paivana when Paivana would not pay. The nature of Paivana's evidence has a tendency to portray Ruiz as an incompetent and unscrupulous cheat who uses the legal system for improper purposes. Such testimony could inflame the jury to decide Grossman's case on an improper emotional basis. We cannot conclude that the court's concern about the danger of undue prejudice was so arbitrary or beyond the bounds of reason that it constitutes an abuse of discretion. (*Johnson*, *supra*, 12 Cal.5th at p. 605; *Miles*, *supra*, 9 Cal.5th at p. 587.)

However, to be properly excluded under section 352, the risks from undue time consumption and/or unfair prejudice must substantially outweigh the probative value of Paivana's testimony. (§ 352; *Miles*, *supra*, 9 Cal.5th at p. 587.) The trial court did not conduct an explicit analysis of the probative value of Paivana's testimony. Contrary to Grossman's arguments, this does not mean that the court erred. When the record is silent on a relevant matter, we presume that the court was both aware of and followed the governing law. (*People v. Czirban* (2021) 67 Cal.App.5th 1073, 1097; *Ruelas v. Superior Court* (2015) 235 Cal.App.4th 374, 383.) Therefore, we view the record as containing an implied finding by the court that the probative value of Paivana's testimony was substantially outweighed by the danger of undue time consumption and/or undue prejudice.

So, viewing the record, we cannot conclude that the trial court's implied finding was so arbitrary or beyond the bounds of reason that it constitutes an abuse of discretion. We agree with Grossman that there appears to be similarities between his circumstances and Paivana's circumstances. Those similarities would have some probative value under section 1101 in that they could be viewed as indicative of a common plan or scheme. However, there would also be differences between this case and Paivana's case. It is likely that different airplanes, different equipment, different installation challenges, and different personalities would be at issue in Paivana's case, which, collectively, tends to weaken the probative value of Paivana's testimony. In contrast, as indicated above, the danger of an undue consumption of time and confusion that would result from Paivana's testimony is particularly high. Further, the court's colorful concern about Paivana disparaging Ruiz's character is a legitimate and substantial concern as the description of Paivana's testimony suggests that Ruiz is a crook who defrauds his customers. The court enjoyed broad discretion to weigh the probative value of Paivana's testimony against the substantial dangers of undue time consumption and/or unfair prejudice. (*Miles*, *supra*, 9 Cal.5th at p. 587.) We cannot conclude as a matter of law that the court improperly

28.

weighed these considerations. At best, Grossman has demonstrated that the exclusion of Paivana's testimony under section 352 is debatable, and it is well established that a merely debatable evidentiary ruling will not constitute an abuse of discretion. (*Johnson*, *supra*, 12 Cal.5th at p. 605; *Jones*, *supra*, 99 Cal.App.5th at p. 1203.) Therefore, the court did not abuse its discretion in weighing the probative value of Paivana's testimony against the dangers of undue time consumption and undue prejudice.

In sum, we conclude that the court's ruling excluding Paivana's testimony under section 352 was not an abuse of discretion. (*Johnson*, *supra*, 12 Cal.5th at p. 605; *Miles*, *supra*, 9 Cal.5th at p. 587; *Jones*, *supra*, 99 Cal.App.5th at p. 1203.)

## **DISPOSITION**

The judgment is affirmed. Respondents are awarded their costs of appeal.

LEVY, Acting P. J.

WE CONCUR:

FRANSON, J.

SNAUFFER, J.

29.